**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DANE STUART,

*Plaintiff*,

v.

ALEXANDER ALVARADO,
also known as "Sergeant Alvarado";
MICHAEL CAPRA,
former Superintendent at Sing Sing Correctional Facility;
JONATHAN P. FRANCO,
also known as "Officer J P Franco";
KEENAN JOHN,
also known as "Officer John";
VICENTE SANTIAGO,
also known as "Officer V. Santiago";
ZUNIEL TORRES,
also known as "Officer Z. Torres"; and
JOHN DOES #1 to X, as yet unidentified employees of DOCCS, each in their individual capacity,

*Defendants*.

No. ___________

**COMPLAINT AND DEMAND FOR A JURY TRIAL**

DANE STUART, by and through his attorneys at Corva Law LLP, alleges and states as follows:

## PRELIMINARY STATEMENT

1. Plaintiff brings this civil rights action pursuant to 42 U.S.C. § 1983 to recover damages sustained from three brutal and unprovoked assaults he endured at the hands of correction officers at Sing Sing Correctional Facility ("Sing Sing") in September 2023 while he was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). The assaults against Plaintiff were acts of retaliation to punish Plaintiff

for his refusal to make extortionate payments to correction officers in connection with an illegal contraband distribution scheme orchestrated by correction staff, and to ensure he did not expose the officers' wrongdoing. The deeply-entrenched culture of corruption and violence within DOCCS, including at Sing Sing, allowed correction staff to profit from the exploitation of incarcerated individuals and employ violence with little fear of consequences.

2. The first assault of Plaintiff occurred on September 5, 2023, when Defendants Correction Officer Jonathan P. Franco ("FRANCO") and Correction Officer Zuniel Torres ("TORRES") attacked Plaintiff without provocation during a pretextual search of Plaintiff's cell that yielded no contraband. During the assault, Plaintiff lost consciousness after his head was slammed against a metal locker and he was struck with an object. When he regained consciousness, Plaintiff's hands had been restrained and another officer, Correction Officer Vicente Santiago ("SANTIAGO"), had him in a chokehold, while officers stomped on his arms and legs, even though he posed no threat to any officer. Still, other officers who were now present, including Correction Officer Keenan John ("JOHN"), did nothing to intervene to stop the officers from mercilessly beating Plaintiff, who was entirely defenseless.

3. A discrete and independent constitutional violation occurred after Plaintiff had been fully restrained. Once Plaintiff's hands were secured and he offered no resistance, he presented no threat to any officer or to institutional security, and no force or any kind was necessary to restore or maintain order. Nonetheless, SANTIAGO applied a chokehold to Plaintiff's neck while other officers stomped on his arms and legs, and one officer yelled, "Break his hands." That force was gratuitous, served no penological purpose whatsoever, and was inflicted to punish and injure Plaintiff, without regard to who initiated the encounter inside the cell.

4. The beating did not cease until Sergeant Alexander Alvarado ("ALVARADO") finally commanded the officers to stop. After Plaintiff had been removed from his cell and taken to the infirmary for medical care, ALVARADO directed another correction officer to search Plaintiff's cell again; a cellphone and related contraband were purportedly found.

5. As a result of the first attack, Plaintiff suffered significant injuries and was transported to a nearby hospital for emergency care. While there, Plaintiff was diagnosed with a hematoma to his head and a right rib contusion, among other injuries. After returning to Sing Sing, Plaintiff required continued medical care and spent the next 30 days in the infirmary.

6. Immediately upon his return to Sing Sing, corrections officers made a concerted effort to silence Plaintiff so that he would not report the unlawful nature of the assault, or the officers' involvement in the lucrative contraband smuggling operation.

7. On September 7, 2023, while Plaintiff's spouse was at Sing Sing for an in-person visit, a correction officer relayed a threat: tell Plaintiff to keep quiet or he would face further violence.

8. Nonetheless, another member of Plaintiff's family reported the unlawful assault and the threat of further violence by filing a formal complaint to the DOCCS Office of Special Investigation ("OSI") that night.

9. Hours later, while Plaintiff was asleep in the infirmary recovering from the initial assault, he was assaulted again, this time by two unknown correction officers who held a blanket over Plaintiff's head so he could not identify them.

10. Plaintiff endured a third assault by unknown correction officers during the early morning hours of September 9, 2023, again while he was asleep in the infirmary (collectively, the "Infirmary Assaults").[1]

11. The Infirmary Assaults left Plaintiff covered in blood and in severe pain. In the days immediately after the Infirmary Assaults, Plaintiff bled from his nose and ears, had difficulty walking and experienced severe head, back and neck pain. He was also disoriented and had extreme difficulty forming words, often stammering, and retrieving memories. Even months later, Plaintiff's pain and suffering continued and he had ongoing elevated blood pressure, a condition he never experienced prior to the Assaults.

12. DOCCS suffers from a pervasive pattern, practice and custom widely reported in extensive media coverage, civil lawsuits, criminal prosecutions and databases maintained by independent organizations involving correction officers using excessive force against incarcerated people. During public testimony on February 13, 2025, Daniel F. Martuscello, then-Acting Commissioner of DOCCS, stated, "Individuals go to prison as punishment, not for punishment, and I will not normalize violence within our system."[2] And yet, excessive and unjustified violence by correction officers was a very normal part of DOCCS and had been for years. In fact, Martuscello gave this testimony more than 17 months after Defendants FRANCO, TORRES and SANTIAGO used excessive force to beat Plaintiff while JOHN stood by; less than two months after correction officers at Marcy Correctional Facility beat Robert Brooks to death;

---

[1] The three assaults of Plaintiff in September 2023 by Sing Sing correction officers are collectively referred to herein as the "Assaults."

[2] *See,* Fiscal Year 2026 Public Protection Budget Hearing, February 13, 2025, Testimony of Daniel F. Martuscello III, Commissioner, available at: https://www.nysenate.gov/sites/default/files/admin/structure/media/manage/filefile/a/2025-02/nys-dept-of-corrections-community-supervision-daniel-f.-martuscello-.pdf

and less than a month before correction officers at Mid-State Correctional Facility beat Messiah Nantwi to death.

13. At Sing Sing, the practice of officers intimidating and abusing inmates to assert their authority and protect their illicit activities existed well before the Assaults. The absence of surveillance cameras or body-worn cameras at Sing Sing enabled the abuses, as it allowed correction officers to operate with a sense of impunity.

14. In February 2022, following a three-day monitoring visit to Sing Sing, the Correctional Association of New York ("CANY") reported "poor relationships between incarcerated people and staff" at Sing Sing and "significant concerns" regarding the lack of surveillance cameras in Sing Sing.[3] CANY made specific recommendations to DOCCS at the time to "expedite the installation of fixed cameras [and] introduce body cameras at Sing Sing". *Id.*

15. Defendant Michael Capra, then-Superintendent of Sing Sing ("CAPRA") did not heed CANY's advice and the violence against incarcerated individuals by correction officers at Sing Sing continued unabated.

16. In November 2022, more than 25 incarcerated individuals reported having been brutally beaten by guards at Sing Sing in unprovoked attacks during a Lockdown and Overall Facility Search. The abuse allegations gave rise to a criminal investigation by federal authorities, national media coverage and are the subject of ongoing civil litigation.

[3] *See* Monitoring Visit to Sing Sing Correctional Facility, Correctional Association of New York Post-Visit Briefing and Recommendations at 2, 9, available at: https://static1.squarespace.com/static/62f1552c1dd65741c53bbcf8/t/63f29d4f10658476fec2f378/1676844371129/2022_PVB-05-Singsing.pdf

17. Corruption, in the form of an illegal contraband distribution scheme, was similarly allowed to flourish. Less than two months after Plaintiff's brutal attack, on November 2, 2023, Jose Esteves-Luciano, a correction officer at Sing Sing was arrested and charged with multiple felony offenses for smuggling illegal contraband into Sing Sing; he later pled guilty to felony offenses for bribe-receiving and promoting prison contraband.

18. On information and belief, the Assaults against Plaintiff were intended to protect a corrupt culture in which correction officers profited from the illegal contraband scheme they operated with impunity by violently punishing Plaintiff for his refusal to make extortionate payments and to ensure that he did not report any misconduct by DOCCS employees. The fact that Plaintiff was then assaulted twice more by unknown correction staff *after* a formal complaint had been filed with OSI demonstrates how deeply-seeded the culture of corruption and violence was at Sing Sing.

19. No supervisory DOCCS employees – including ALVARADO or CAPRA – took any steps to intervene, discipline or train the officers who assaulted Plaintiff on September 5, 2023, or to otherwise prevent Plaintiff from being assaulted again by correction officers while he lay defenseless in the infirmary recovering from the injuries inflicted by FRANCO, TORRES and SANTIAGO.

20. ALVARADO and CAPRA each personally knew that Plaintiff faced a substantial risk of serious harm from correction officers at Sing Sing, and each personally disregarded that risk. ALVARADO learned of the September 5, 2023 assault by witnessing it and ordering it stopped. CAPRA was notified of the assault, and of an express threat of further violence against Plaintiff, through the formal OSI complaint filed on September 7, 2023 at the latest. Each had the

authority to protect Plaintiff, and each failed to take any step that would have prevented the two beatings Plaintiff suffered in the infirmary on September 8, and September 9, 2023.

21. Plaintiff seeks redress pursuant to 42 U.S.C. § 1983 for Defendants' repeated violations of his rights under the Eighth and Fourteenth Amendments to the United States Constitution. For his injuries, Plaintiff seeks damages, both compensatory and punitive, an award of costs and attorneys' fees, and any such other and further relief as this Court may find to be just and appropriate.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4). This action arises under the Eighth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983.

23. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this judicial district.

## PARTIES

24. Plaintiff DANE STUART is an incarcerated individual in the custody of DOCCS. At all times relevant to this Compliant, Plaintiff was confined at Sing Sing Correctional Facility in Ossining, New York. Plaintiff is currently confined at Green Haven Correctional Facility in Stormville, New York.

25. At all times relevant to this Complaint, Defendant ALEXANDER ALVARADO was employed by DOCCS at Sing Sing as a Sergeant, and as such he was responsible for the safety and security of the incarcerated individuals confined therein.

26. At all times relevant to this Complaint, Defendant MICHAEL CAPRA was employed by DOCCS as the Superintendent of Sing Sing, and as such he was responsible for the safety and security of the incarcerated individuals confined therein.

27. At all times relevant to this Complaint, Defendant JONATHAN P. FRANCO was employed by DOCCS as a Correction Officer at Sing Sing, and as such he was responsible for the safety and security of the incarcerated individuals confined therein.

28. At all times relevant to this Complaint, Defendant KEENAN JOHN was employed by DOCCS as a Correction Officer at Sing Sing, and as such he was responsible for the safety and security of the incarcerated individuals confined therein.

29. At all times relevant to this Complaint, Defendant VICENTE SANTIAGO was employed by DOCCS as a Correction Officer at Sing Sing, and as such he was responsible for the safety and security of the incarcerated individuals confined therein.

30. At all times relevant to this Complaint, Defendant ZUNIEL TORRES was employed by DOCCS as a Correction Officer at Sing Sing, and as such he was responsible for the safety and security of the incarcerated individuals confined therein.

31. At all times relevant to this Complaint, Defendants JOHN DOES #1 to X, as yet unidentified, who participated in the Infirmary Assaults and/or failed to intervene to stop the Assaults, were employed by DOCCS at Sing Sing, and as such were responsible for the safety and security of the incarcerated individuals confined therein.

32. At all relevant times, Defendants were state actors and acted under color of the laws, statutes, ordinances, regulations, policies, customs, and usages of the State of New York.

## FACTUAL ALLEGATIONS

I. Background on Corruption at Sing Sing

33. Between 2021 and 2023, Plaintiff was incarcerated in the A block of Sing Sing, first in the K gallery and later in the H gallery.

34. Upon information and belief, in or about 2021, two Sing Sing staff members, including JOHN (who Plaintiff knew as "Officer John"), believed Plaintiff made money from a friendly pool where inmates placed wagers on the outcomes of sporting events. In or about 2021, JOHN and his colleague told Plaintiff, in substance, that Plaintiff would need to provide them with a weekly monetary payment and made clear to him that if he did not comply with this directive, Plaintiff would incur harm.

35. Plaintiff initially did not make the payments, but after correction officers started regularly harassing him, Plaintiff relented and started to make regular payments to JOHN and his colleague.

36. Plaintiff knew that incarcerated individuals who had contraband in their cells such as cell phones also paid regular extortion payments to correction officers at Sing Sing.

37. While in the K Gallery, Plaintiff became a "water porter." When he began serving as a water porter, Plaintiff learned from correction officers about an organized smuggling ring through which several correction officers snuck contraband concealed in coolers into Sing Sing, including iPhones, illegal drugs and weapons.

38. Upon information and belief, after the contraband was successfully smuggled into the facility, the correction officers relied on the water porters to distribute the contraband (now concealed within manilla envelopes) to other incarcerated individuals.

39. Plaintiff was advised by correction officers that distributing the contraband was a condition of his service as a water porter.

40. Plaintiff did not seek out the position of water porter and was not compensated in any way for his role in distributing any envelopes that may have contained contraband.

41. After serving as the water porter for several months, Plaintiff told the correction officers that he no longer wished to serve as a water porter if he would be required to distribute the contraband.

42. Plaintiff was allowed to stop serving as a water porter.

43. Shortly thereafter, in approximately May 2023, Plaintiff was transferred to the H gallery.

44. When he arrived in the H Gallery, JOHN and his colleague continued to collect extortion payments from Plaintiff.

45. In or about August 2023, Plaintiff stopped making payments to JOHN and his colleague. In response, JOHN and his colleague confronted Plaintiff about his failure to make the payments and told Plaintiff in no uncertain terms that he would "regret it" if he did not resume making the payments. Plaintiff responded that he would resume payments in the Fall, but refused to make payments until then.

46. JOHN's threat that Plaintiff would "regret it" was made approximately one month before the Assaults, and it identified JOHN as a correction officer with a direct personal financial stake in compelling Plaintiff's continued payments and in preventing Plaintiff from reporting the extortion and contraband schemes.

47. Shortly after the Assaults, Correction Officer Jose Estevez-Luciano was arrested for his involvement in an illegal smuggling operation at Sing Sing during this time. Specifically, an indictment alleged that between October 14, 2021 and August 2, 2023, Estevez-Luciano conspired to, and did, deliver cellphones and other contraband to incarcerated individuals at Sing Sing in exchange for payments. Estevez-Luciano later pled guilty to multiple felony offenses, including Promoting Prison Contraband in the First Degree.

II. The Initial Assault

48. Records from DOCCS show that ALVARADO directed Correction Officers FRANCO, TORRES and SANTIAGO to conduct a search of Plaintiff's cell.

49. On Tuesday, September 5, 2023, at approximately 6:00 p.m., FRANCO and TORRES initiated a search of Plaintiff's cell in the H gallery.[4]

50. At the direction of FRANCO and TORRES, Plaintiff stepped outside of his cell. While Plaintiff remained outside of his cell, FRANCO and TORRES removed each of several cases of bottled water from Plaintiff's cell and stacked them up outside of Plaintiff's cell. Once they finished, FRANCO and TORRES told Plaintiff that they would take one of the water cases for themselves and then switched course, telling Plaintiff that he could return all of the cases to the cell by himself.

51. At the officers' direction, Plaintiff then stepped back inside his cell.

52. Once inside, FRANCO and TORRES asked Plaintiff, in substance, whether he knew of "stuff going on" that the officers "should know of."

[4] Plaintiff did not recognize either of the officers who conducted the search of his cell on September 5, 2023, but did see that one wore a name tag that identified him as "Franco."

53. When Plaintiff twice claimed he did not have any such knowledge, one of the officers commented, in substance, "Have it your way," and FRANCO and TORRES began to physically attack Plaintiff. The attack was swift, brutal and without provocation.

54. One officer grabbed Plaintiff by the neck and forced Plaintiff to his knees. One of the officers elbowed Plaintiff in his back. While Plaintiff was kneeling, FRANCO slammed Plaintiff's head against the locker in the cell and struck Plaintiff's head with what appeared to Plaintiff to be a baton. Plaintiff heard one of the officers remark, "You Black motherfucker." Upon information and belief, Plaintiff then lost consciousness.

55. When he regained consciousness, Plaintiff realized that additional officers had responded to his cell and his hands had been restrained. Notwithstanding the restraints and the absence of any resistance by Plaintiff, the brutal attack on Plaintiff continued. SANTIAGO had Plaintiff in a chokehold, and other officers stomped on his arms and legs. One officer yelled, "Break his hands." Plaintiff also saw JOHN inside of his cell.

56. At the time SANTIAGO applied the chokehold and other officers stomped on Plaintiff's arms and legs, Plaintiff was mechanically restrained, was not resisting, was not attempting to strike any officer, and was physically incapable of posing any threat to the officers or to institutional security. There was no need for any application of force at that moment, and the force applied bore no relationship to any legitimate need. No officer made any effort to temper the severity of the force used against a restrained and defenseless man.

57. The first assault ended only after ALVARADO, who had responded to Plaintiff's cell with other officers, commanded the officers to stop and commented, in substance, "We don't do stuff like that."

58. Records from DOCCS show that ALVARADO supervised the transport of Plaintiff from his cell in the H gallery to the infirmary within Sing Sing and that a hand-held camera was used to record the transport.

59. A male nurse, whose last name is, upon information and belief, Glukhan, also came to treat Plaintiff.

60. Plaintiff was then left in the infirmary with an officer and a sergeant (different from the individuals who had been in his cell), who then began to question Plaintiff about his knowledge of alleged corruption within the facility, including contraband schemes and a scheme where certain female officers had sexual contact with incarcerated individuals in exchange for money.

61. Plaintiff, who was both scared and in intense pain as a result of the vicious attack, provided minimal answers in an attempt to hasten his receipt of medical attention and to prevent a further assault for reporting misconduct by correctional staff.

62. Eventually, a state van transported Plaintiff to Mount Vernon Hospital for medical treatment. At approximately 8:51 p.m., Plaintiff arrived at Mount Vernon Hospital, where, according to medical records, Plaintiff reported that he had been "jumped" and complained of "head, neck, back and right-sided chestwall pain."

63. Upon information and belief, doctors at Mount Vernon Hospital diagnosed Plaintiff with a hematoma to his head and a right rib contusion and prescribed x-rays and CT scans. Upon information and belief, the scans revealed multiple abnormalities, including (1) a "loss of the normal cervical lordosis which can be seen with muscle spasm or postural/positional change," (2) "mild intervertebral disc space loss at L3-4, L4-5, L5-S1" and "mild bilateral neural foraminal narrowing at these levels"; (3) "mild lumbar spondylosis with associated mild neural

foraminal narrowing" and (4) "paranasal sinuses demonstrate mild mucosal thickening without air-fluid level."

64. Later that evening, Plaintiff was discharged and returned to the infirmary unit within Sing Sing. He was confined in the Special Housing Unit ("SHU") cell (*i.e.*, room A202) within the infirmary, where he remained for the next month.

65. Records from DOCCS indicate that Plaintiff's account that the assault was unlawful circulated quickly among supervisors within Sing Sing.

III. <u>Attempt to Threaten and Intimidate Stuart and his Family Into Silence</u>

66. On Thursday, September 7, 2023, Plaintiff's wife visited Plaintiff at Sing Sing. Upon information and belief, during the visit, a correction officer slipped Plaintiff's wife a piece of paper with a telephone number with the last four digits 6454 (the "6454 Telephone") handwritten on it.[5]

67. Upon information and belief, later on September 7, 2023, while still at Sing Sing, Plaintiff's wife encountered the same officer again when she asked about the location of the bathroom, at which time the officer told her, in substance, to call the number on the paper and threatened, "Don't say anything or he [*i.e.*, Plaintiff] will not leave Sing Sing."

68. Upon information and belief, a lookup of the CashApp mobile payment service links the 6454 Telephone to a user account in the name "Keenan John."

69. Upon information and belief, the 6454 Telephone that the officer passed to Plaintiff's wife, accompanied by the threat that Plaintiff "will not leave Sing Sing," therefore belongs to JOHN, the same officer who had been collecting extortion payments from Plaintiff,

---

[5] Plaintiff has the full telephone number for the 6454 Telephone, but, in an abundance of caution, does not include it herein.

who had warned Plaintiff that he would "regret it" if the payments stopped, and who was present inside Plaintiff's cell during the September 5, 2023 assault.

70. Despite the threat to Plaintiff's physical safety, a member of Plaintiff's family filed an official complaint via email to the OSI that night, September 7, 2023. According to the DOCCS website:

> OSI's fundamental goal is to prevent, detect, and investigate abuse, fraud, waste, misconduct, corruption, and criminal activity, among other matters, and to help promote integrity within New York State's correctional and community supervision system.[6]

71. The complaint provided notice to OSI of both the unlawful nature of the assault on Plaintiff, and the threat made to Plaintiff's wife about the potential for future violence.

IV. Infirmary Assaults

72. Early the following morning, on Friday, September 8, 2023, Plaintiff was viciously beaten by two unknown correction officers (i.e., JOHN DOE Defendants) while he slept in room A202 of the infirmary unit of Sing Sing.

73. Approximately a day later, on or about the morning of Saturday, September 9, 2023, Plaintiff awoke once again to another beating by unknown correction officers (i.e., JOHN DOE Defendants) in the same room.

74. Because the lights were continuously kept on in room A202, Plaintiff slept with his blanket covering his face. During the assaults on September 8, 2023 and September 9, 2023, the officers forcefully kept the blanket pulled over Plaintiff's head, hit him with closed fists and told Plaintiff to stay quiet, a message he understood to mean not to share with anyone the attacks he

[6] Available at: https://doccs.ny.gov/office-special-investigations-osi#:~:text=OSI's%20fundamental%20goal%20is%20to,correctional%20and%20community%20supervision%20system.

suffered at the hands of correction officers or his knowledge of the ongoing corruption at Sing Sing.

75. During each of the Infirmary Assaults, Plaintiff was asleep in a hospital bed in a locked infirmary cell, recovering from the injuries inflicted three days earlier. He was unarmed, was not resisting, had received no order of any kind, and posed no threat whatsoever to any officer or to institutional security. The officers who beat him did so while deliberately holding a blanket over his face so that he could not see or identify them.

76. In the midst of the September 9, 2023 assault, one of the officers, appearing spooked, commented, “He’s bleeding. Let’s go.”

77. As a result of the assaults on September 8, 2023 and September 9, 2023, Plaintiff’s clothing and sheets were noticeably bloody.

78. Because the JOHN DOE Defendants concealed their identities by covering Plaintiff’s face throughout each of the Infirmary Assaults, Plaintiff could not identify them by name or appearance. Plaintiff has diligently sought to ascertain their identities and has pursued discovery concerning the Assaults in his pending action in the New York State Court of Claims, Claim No. 142611. Plaintiff will seek leave to substitute the true names of the JOHN DOE Defendants promptly upon ascertaining them.

79. ALVARADO encountered Plaintiff on or about Monday, September 11, 2023, at which time he directed others to provide Plaintiff with clean clothing and sheets and conveyed to Plaintiff that he would ensure that the beatings ceased.

80. According to Sing Sing medical records for Plaintiff, on the early afternoon of Monday, September 11, 2023, “Nurse Stewart” observed a trail of dried blood on the floor and blood on Plaintiff’s clothing and sheets.

81. In the subsequent days, Plaintiff continued to bleed from his nose and his ears.

82. Notwithstanding the continued bleeding from his nose and ears, which are often signs of serious complications of a concussion, the medical staff at Sing Sing did not promptly seek further medical care for Plaintiff outside the facility. While Plaintiff did not suffer any further beatings after September 9, 2023, the physical and emotional distress remained for weeks and he continues to suffer from lingering effects and emotional distress today.

83. Plaintiff also suffered cognitively. Upon information and belief, Plaintiff's wife reported that beginning in her first phone call with Plaintiff after the initial assault in his cell and continuing for a period of weeks after the Assaults, she barely recognized her husband's voice and relayed that while he previously was very articulate and communicative, after the initial assault, Plaintiff appeared disoriented and had extreme difficulty forming words and retrieving memories.

84. Sing Sing medical records show that on September 6, 2023, the day after the first assault, Plaintiff expressed difficulty remembering a telephone call he made; and that on September 8, 2023, the day of the second assault, Plaintiff could not even recall his own name.

85. Upon information and belief, the records further show that Plaintiff complained of memory loss on other occasions in the days after the first assault; nose bleeds; and head, back and neck pain; and that other medical professionals observed that when Plaintiff spoke, Plaintiff spoke in a low tone and sometimes with a slur or stutter.

V. Failure to Intervene to Protect Plaintiff

86. As a DOCCS Sergeant, ALVARADO held a supervisory role over the correction officers at Sing Sing. ALVARADO was aware that FRANCO, TORRES and SANTIAGO used excessive force against Plaintiff in violation of his constitutional rights in real time.

87. Between September 5, 2023 and September 8, 2023, ALVARADO took no step to protect Plaintiff from the officers he knew had assaulted him. Upon information and belief, ALVARADO did not remove Plaintiff from an area accessible to those officers, did not restrict those officers' access to Plaintiff, did not arrange for Plaintiff to be monitored or safeguarded, did not discipline the officers or otherwise report the assault for investigation, and did not seek Plaintiff's transfer to a safe housing location.

88. ALVARADO's statement to Plaintiff on or about September 11, 2023 that he would ensure that the beatings ceased confirms that ALVARADO knew beatings had continued after September 5, 2023, and that ALVARADO had the practical authority to stop them. Had ALVARADO exercised that authority before September 8, 2023, the Infirmary Assaults would not have occurred.

89. As the Superintendent of Sing Sing, CAPRA was, upon information and belief, made aware that correction officers under his supervision at Sing Sing had used excessive force against Plaintiff in violation of his constitutional rights at or near the time Plaintiff was transported to the hospital for emergency medical care on September 5, 2023.

90. The formal complaint filed with OSI on September 7, 2023 reported both that Plaintiff had been unlawfully assaulted by correction officers and that Plaintiff's wife had been told, "Don't say anything or he will not leave Sing Sing." That complaint communicated, in express terms, that Plaintiff faced a substantial risk of further violence at the hands of Sing Sing staff.

91. Upon information and belief, CAPRA personally received, or was personally informed of the substance of the September 7, 2023 OSI complaint, including the report of the assault and the threat of further violence against Plaintiff, before the Infirmary Assaults occurred.

92. Upon information and belief, CAPRA drew the inference that Plaintiff faced a substantial risk of serious harm. CAPRA knew that Plaintiff had just been beaten by staff, that staff had threatened his family with further violence if he spoke, and that Plaintiff remained confined in an infirmary cell within the same facility, accessible to the same staff.

93. CAPRA had the authority to restrict staff access to Plaintiff, to transfer Plaintiff to protective housing or another facility, to suspend or reassign the officers involved pending investigation, and to order that Plaintiff be safeguarded. CAPRA disregarded the known risk and exercised none of that authority.

94. Nonetheless, neither ALVARADO, CAPRA, nor any other employee of DOCCS, took sufficient steps to protect Plaintiff from the two subsequent assaults that occurred on or about September 8, 2023 and September 9, 2023.

95. Upon information and belief, no disciplinary measures were taken against any of the officers who participated in any of the Assaults.

## VI. The Misbehavior Reports and Conspiracy to Cover Up Plaintiff's Unprovoked Assault

96. Between September 5, 2023 and early October 2023, Plaintiff was confined within the SHU portion of the Sing Sing infirmary.

97. In early October 2023, Plaintiff was transferred from the infirmary unit to the standalone SHU.

98. Until his transfer to the standalone SHU, no one at Sing Sing had told Plaintiff that he would receive a misbehavior report.

99. In or about October 2023, following his transfer to the standalone SHU, Plaintiff was served with two misbehavior reports (the "Two Misbehavior Reports") that alleged purported misconduct by Plaintiff on September 5, 2023.

100. The Two Misbehavior Reports contained fabricated allegations and, upon information and belief, were designed to cover up the brutal assault of Plaintiff on September 5, 2023.

101. In the first report (the "First Misbehavior Report"), Plaintiff was charged with (1) violent conduct, in violation of 7 N.Y.C.R.R. § 270.2, Rule 104.11; (2) assault on staff, in violation of 7 N.Y.C.R.R. § 270.2, Rule 100.11; (3) interference with an employee, in violation of 7 N.Y.C.R.R. § 270.2, Rule 107.10; (4) refusing a direct order, in violation of 7 N.Y.C.R.R. § 270.2, Rule 106.10; and (5) refusing a search or frisk, in violation of 7 N.Y.C.R.R. § 270.2, Rule 115.10, all based on conduct that purportedly occurred on September 5, 2023.

102. DOCCS officers are required to truthfully complete Misbehavior Reports.

103. The First Misbehavior Report was signed by FRANCO and included false information provided by FRANCO, including that during the September 5, 2023 cell search, Plaintiff had "suddenly and without warning, pushed Officer Torres with his left hand and entered the cell;" pushed FRANCO "towards the rear of the cell," and "[f]orce became necessary for self-defense."

104. In the second report (the "Second Misbehavior Report"), Plaintiff was charged with possession of contraband, in violation of 7 N.Y.C.R.R. § 270.2, Rule 113.23, based on a cellular telephone and accessories that were purportedly found in Plaintiff's cell during the second search on September 5, 2023.

105. The Second Misbehavior Report was signed by Correction Officer Minerva Salas and included false information purportedly provided by Officer Salas. According to the Second Misbehavior Report, Officer Salas conducted a second search of Plaintiff's cell on September 5, 2023, beginning at approximately 6:15 p.m. According to the Second Misbehavior Report,

Officer Salas recovered a black sock "concealed" within "the middle of a case of bottled water, towards the left side of the cell" that contained an iPhone, a charging cord, headphones, a charging cube and two adaptors. The purported author – Officer Salas – also wrote, "I directed Officer Salas to maintain possession of the contraband items and to continue to the cell search."

106. A Disciplinary Hearing was conducted at Sing Sing on various dates between October 6, 2023 and October 17, 2023. At the disciplinary hearing, FRANCO, TORRES, and SANTIAGO each falsely testified that their use of force against Plaintiff on September 5, 2023 was justified and necessary in self-defense.

107. At the hearing, DOCCS was unable to produce the video recording that was created under ALVARADO's supervision when Plaintiff was transported to the infirmary moments after the assault. Upon information and belief, the video recording was destroyed by a DOCCS employee to conceal evidence of the assault even though DOCCS had an obligation to preserve it under these circumstances.

108. The destruction of the video recording deprived Plaintiff of contemporaneous visual evidence of his injuries and of the officers involved, and notably happened more than a year after CANY recommended that DOCCS "expedite the installation of fixed cameras, introduce body cameras at Sing Sing, and ensure that footage from cameras is readily accessible to oversight bodies and the public".[7]

109. Plaintiff requested to call ALVARADO at the disciplinary hearing but the request was denied by a Disciplinary Hearing Officer ("DHO"), due to his apparent unavailability.

---

[7] *See* Monitoring Visit to Sing Sing Correctional Facility, Correctional Association of New York Post-Visit Briefing and Recommendations at 9, available at: https://static1.squarespace.com/static/62f1552c1dd65741c53bbcf8/t/63f29d4f10658476fec2f378/1676844371129/2022_PVB-05-Singsing.pdf

110. Plaintiff also requested to call Officer Salas, whom ALVARADO directed to search Plaintiff's cell for a second time after the assault even though FRANCO and TORRES' search had yielded no contraband. The DHO indicated that the request was being denied due to Officer Salas's apparent unavailability.

111. The DHO initially found that the violations in the Two Misbehavior Reports had been proven and sentenced Plaintiff to a punitive term in the SHU.

112. Plaintiff subsequently appealed those findings and ultimately, following Article 78 proceedings filed by Plaintiff, DOCCS reversed the DHO's findings and expunged any reference to the incident from Plaintiff's institutional record.

113. No adjudicated finding therefore supports the officers' claim that Plaintiff engaged in violent conduct, assaulted staff, refused a direct order, refused a search or frisk, or possessed contraband on September 5, 2023.

## VII. Supervisory Defendants Were Deliberately Indifferent to the Risk to Plaintiff's Safety

114. According to the DOCCS website, it is part of the agency's mission to provide "safe and secure facilities where all incarcerated individuals' needs are addressed," through policies designed to "establish an orderly and productive environment that fosters respect through open communication, sound structure, and fair treatment."[8]

115. CAPRA assumed oversight of Sing Sing as Superintendent in or about 2012.

116. As the Superintendent of Sing Sing, CAPRA was responsible for overseeing all aspects of the daily operations of the facility, including safety, security, staff management, and administration. CAPRA was responsible for devising and implementing policies and practices to ensure that the correctional staff under his supervision at Sing Sing did not violate the

[8] Available at: https://doccs.ny.gov/departments-mission

constitutional rights of incarcerated individuals, and for enforcing the policies by intervening to impose discipline and introduce protective guardrails when violations occurred.

117. In publicly available remarks made on June 6, 2023, shortly before the Assaults, CAPRA highlighted the importance of discipline in DOCCS: "When the public thinks about prison, they associate it with punishment. When I think about prison, I associate it with Structure, Discipline, Education, Vocation and Families."[9]

118. The Assaults were not the first time that correction officers at Sing Sing used excessive force in violation of the constitutional rights of incarcerated individuals. Nor were they the first time CAPRA was on notice of the same.

119. In November 2022, more than 20 individuals incarcerated at Sing Sing required medical attention, including seven who were transported to the hospital, after corrections officers used excessive and unjustified force against them after storming their cells during a coordinated prisonwide search. In January 2023, 26 of the incarcerated individuals sued New York State, filing sworn affidavits attesting to the beatings they received.[10]

120. Another individual incarcerated at Sing Sing reported that he was the victim of excessive force by correction officers at Sing Sing on September 4, 2023 - the day before the initial assault on Plaintiff. In a lawsuit subsequently filed in the Southern District of New York, the incarcerated individual reported that, much like Plaintiff, two correction officers entered his cell and assaulted him "without a necessary warning or explanation" and in a manner that

---

[9] Available at:
https://www.nysenate.gov/newsroom/press-releases/2023/pete-harckham/harckham-honors-sing-sing-correctional-staff-members

[10] *See* Benjamin Weiser, "*At Sing Sing, Prisoner's Charges of Brutal Beatings Prompt U.S. Inquiry",* New York Times, Feb. 23, 2023, available at:
https://www.nytimes.com/2023/02/23/nyregion/sing-sing-beatings-investigation.html

included striking him on the head with a stick, causing Matthews to briefly lose consciousness. *See Matthews v. Ruquet, et al.,* 24-CV-05589 (PMH) (SDNY).[11]

121. The New York Civil Liberties Union maintains and makes publicly available a DOCCS misconduct database that includes thousands of records of misconduct by DOCCS employees occurring between 2000 and 2020.[12] The database contains more than 650 substantiated reports for DOCCS employees at Sing Sing during this time period, including numerous incidents involving the use of excessive force and the possession of contraband.

122. Upon information and belief, the volume of substantiated misconduct findings involving Sing Sing staff was known and available to CAPRA, who bore direct responsibility for staff discipline at the facility.

123. CAPRA was also on notice of SANTIAGO's propensity for violence. On December 22, 2018, SANTIAGO, who participated in the assault on Plaintiff in 2023, was arrested by officers with the New York City Police Department after he choked and otherwise assaulted an individual. SANTIAGO was ultimately permitted to remain employed by DOCCS.

124. SANTIAGO's arrest for choking a person placed DOCCS on notice that SANTIAGO had a propensity to apply violent force, and specifically to apply force to a person's neck. Notwithstanding that notice, DOCCS retained SANTIAGO, assigned him to duties involving physical contact with incarcerated individuals, and imposed no measure to prevent him from applying such force again. Upon information and belief, CAPRA knew and personally had available to him the facts of SANTIAGO's arrest and retention. On September 5, 2023,

[11] Matthews' lawsuit was later dismissed on procedural grounds.
[12] Available at: https://www.nyclu.org/data/misconduct-database-new-york-state-department-of-corrections-and-community-supervision-doccs

SANTIAGO applied a chokehold to Plaintiff's neck while Plaintiff was restrained and non-resisting.

125. CAPRA was on notice of the pattern and practice of correction officers using excessive force against incarcerated individuals, including in cells during purported enforcement actions. And, more specifically, as of September 7, 2023 at the latest, CAPRA had subjective knowledge of a substantial risk of serious harm to Plaintiff and disregarded it.

126. Upon information and belief, Defendants ALVARADO, CAPRA, JOHN and other unidentified DOCCS employees were in a position to intervene to prevent or mitigate the assaults.

127. Upon information and belief, Defendants ALVARADO, CAPRA, JOHN and such unidentified DOCCS employees took no reasonable steps to intervene to prevent or mitigate the Assaults, other than ALVARADO's directive that FRANCO, TORRES and SANTIAGO stop the initial assault after Plaintiff had been severely injured.

128. Upon information and belief, if there had been such intervention then the Assaults would have been stopped.

## **FIRST CAUSE OF ACTION**

EXCESSIVE FORCE:
Deprivation of federal civil rights secured under the
Eighth and Fourteenth Amendments to the United States Constitution

(Brought against Defendants FRANCO, TORRES, SANTIAGO and JOHN)

129. Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if fully set forth herein.

130. By their conduct and actions on September 5, 2023, Defendants FRANCO, TORRES, SANTIAGO and JOHN, acting in concert and under color of law, deprived Plaintiff of the rights, privileges or immunities secured and guaranteed to him by the Eighth and Fourteenth Amendments to the U.S. Constitution.

131. Without lawful justification, Defendants knowingly, intentionally, maliciously and deliberately caused injury and damage to Plaintiff by physically assaulting him using a degree of force that was excessive and unreasonable.

132. Defendants' use of force was not applied in good faith, and lacked any legitimate penological purpose for restoring or maintaining discipline. Plaintiff posed no threat to Defendants or to institutional security at the time of the assault. He did not resist, threaten, or attempt to harm any officer.

133. Independently, and without regard to how the encounter inside the cell began, Defendants applied substantial force to Plaintiff after he had been mechanically restrained and after all resistance, if any, had ceased. SANTIAGO applied a chokehold to Plaintiff's neck, and officers stomped on Plaintiff's arms and legs, while Plaintiff lay restrained, defenseless, and posing no threat. One officer's exhortation to "Break his hands" reflects that the purpose of this force was to injure and punish Plaintiff, not to restore order.

134. There was no need for any application of force against a restrained and compliant Plaintiff; the amount of force bore no relationship to any conceivable need; Defendants faced no threat to the safety of staff or inmates at that time; and Defendants made no effort to temper the severity of their response. This post-restraint force was applied maliciously and sadistically for the purpose of causing harm.

135. Defendants' use of force was applied in retaliation for Plaintiff's refusal to participate in extortion and contraband schemes, involving Defendant JOHN, and to prevent him from reporting officers' misconduct. Defendant JOHN had personally collected extortion payments from Plaintiff, had warned Plaintiff approximately one month earlier that he would "regret it" if the payments stopped, and had an interest in preventing Plaintiff from reporting the extortion and contraband schemes.

136. Defendants' statement, "Have it your way," made immediately after Plaintiff denied knowledge of "stuff going on" at the facility and immediately before the assault began, as well as the racial epithet directed at Plaintiff during the beating, further establish that Defendants acted out of malice and to punish Plaintiff, not to maintain or restore discipline.

137. As a direct and proximate result of the foregoing, Plaintiff was assaulted and damaged on September 5, 2023, as set forth above, and suffered significant physical and ongoing physical and mental pain and anguish.

## SECOND CAUSE OF ACTION

FAILURE TO INTERVENE:
Deprivation of federal civil rights secured under the
Eighth and Fourteenth Amendments to the United States Constitution

(Brought against Defendant JOHN)

138. Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if fully set forth herein.

139. By his conduct and actions on September 5, 2023, Defendant JOHN, acting under color of law, deprived Plaintiff of the rights, privileges or immunities secured and guaranteed to him under the Eighth and Fourteenth Amendments to the U.S. Constitution.

140. Defendant had a legal duty to intervene to prevent the use of excessive force by fellow officers in his presence.

141. Defendant was present inside Plaintiff's cell while fellow officers applied excessive force to Plaintiff. Plaintiff saw JOHN inside his cell after Plaintiff regained consciousness and while SANTIAGO held Plaintiff in a chokehold and other officers stomped on Plaintiff's arms and legs.

142. Defendant observed, and had reason to know of, the use of excessive force against Plaintiff, who was by then restrained and offering no resistance.

143. Defendant had a reasonable opportunity to intervene. The force continued for a sufficient period after Plaintiff was restrained that ALVARADO was able to command the officers to stop and thereby end it.

144. Defendant failed to intervene. He took no step to stop the officers, to order them to desist, to summon a supervisor, or to protect Plaintiff.

145. Defendant's failure to intervene was motivated by his own interest in the extortion scheme. JOHN had personally collected extortion payments from Plaintiff, had warned Plaintiff approximately one month earlier that he would "regret it" if the payments stopped, and had an interest in preventing Plaintiff from reporting the extortion and contraband schemes. Upon information and belief, the telephone number that a correction officer passed to Plaintiff's wife on September 7, 2023, together with the threat that Plaintiff "will not leave Sing Sing," is linked to JOHN.

146. As a direct and proximate result of the foregoing, Plaintiff was assaulted and damaged on September 5, 2023, as set forth above, and suffered significant physical and ongoing physical and mental pain and anguish.

## THIRD CAUSE OF ACTION

EXCESSIVE FORCE:
Deprivation of federal civil rights secured under the
Eighth and Fourteenth Amendments to the United States Constitution

(Brought against Defendants JOHN DOES #1-X)

147. Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if fully set forth herein.

148. By their conduct and actions during the early morning hours of September 8, 2023, in room A202 of the infirmary unit at Sing Sing, Defendants JOHN DOES #1-X, acting in concert and under color of law, deprived Plaintiff of the rights, privileges or immunities secured and guaranteed to him by the Eighth and Fourteenth Amendments to the U.S. Constitution.

149. Without lawful justification, Defendants knowingly, intentionally, maliciously and deliberately caused injury and damage to Plaintiff by physically assaulting him using a degree of force that was excessive and unreasonable. Specifically, while Plaintiff slept, Defendants forcefully held Plaintiff's blanket over his head and face and struck him repeatedly with closed fists, while telling Plaintiff to stay quiet.

150. Defendants' use of force was not applied in good faith, and lacked any legitimate penological purpose for restoring or maintaining discipline. Plaintiff, who was asleep in bed in a locked infirmary cell recovering from injuries previously inflicted by DOCCS employees, posed no threat to Defendants or to institutional security at the time of the assault. He did not resist, threaten, or attempt to harm any officer. No order was given to him, and no disturbance was underway.

151. Defendants held the blanket over Plaintiff's face throughout the assault in order to conceal their identities and prevent Plaintiff from identifying them.

152. Defendants' use of force was applied for the purpose of inflicting punishment upon and causing harm to Plaintiff in retaliation for Plaintiff's refusal to participate in extortion and contraband schemes orchestrated by DOCCS employees, and to prevent him from reporting officers' misconduct. Defendants' command that Plaintiff "stay quiet" conveyed that purpose directly, and the assault followed within hours of the filing of the OSI complaint reporting the September 5, 2023 assault.

153. As a direct and proximate result of the foregoing, Plaintiff was assaulted and damaged on or about September 8, 2023, as set forth above, and suffered significant physical and ongoing physical and mental pain and anguish.

**<u>FOURTH CAUSE OF ACTION</u>**

EXCESSIVE FORCE:
Deprivation of federal civil rights secured under the
Eighth and Fourteenth Amendments to the United States Constitution

(Brought against Defendants JOHN DOES #1-X)

154. Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if fully set forth herein.

155. By their conduct and actions on or about September 9, 2023, Defendants JOHN DOES #1-X, acting in concert and under color of law, deprived Plaintiff of the rights, privileges or immunities secured and guaranteed to him by the Eighth and Fourteenth Amendments to the U.S. Constitution.

156. Without lawful justification, Defendants knowingly, intentionally, maliciously and deliberately caused injury and damage to Plaintiff by physically assaulting him using a degree of force that was excessive and unreasonable. Specifically, while Plaintiff slept, Defendants

forcefully held Plaintiff's blanket over his head and face and struck him repeatedly with closed fists, while telling Plaintiff to stay quiet.

157. Defendants' use of force was not applied in good faith, and lacked any legitimate penological purpose for restoring or maintaining discipline. Plaintiff, who was asleep in bed in a locked infirmary cell recovering from injuries previously inflicted by DOCCS employees, posed no threat to Defendants or to institutional security at the time of the assault. He did not resist, threaten, or attempt to harm any officer. No order was given to him, and no disturbance was underway.

158. The severity of the force is reflected in one officer's own words. In the midst of the assault, one of the officers, appearing spooked, commented, "He's bleeding. Let's go." As a result of the beating, Plaintiff's clothing and sheets were noticeably bloody, and a nurse observed a trail of dried blood on the floor of the cell two days later.

159. Defendants' use of force was applied for the purpose of inflicting punishment upon and causing harm to Plaintiff in retaliation for Plaintiff's refusal to participate in extortion and contraband schemes orchestrated by DOCCS employees, and to prevent him from reporting officers' misconduct.

160. As a direct and proximate result of the foregoing, Plaintiff was assaulted and damaged on or about September 9, 2023, as set forth above, and suffered significant physical and ongoing physical and mental pain and anguish.

## FIFTH CAUSE OF ACTION

DELIBERATE INDIFFERENCE / FAILURE TO PROTECT:
Deprivation of federal civil rights secured under the
Eighth and Fourteenth Amendments to the United States Constitution

(Brought against Defendants ALVARADO and CAPRA)

161. Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if fully set forth herein.

162. Defendants ALVARADO and CAPRA were directly and personally responsible for the safety of the people incarcerated at Sing Sing, including Plaintiff.

163. By their own conduct and actions on or about and between September 5, 2023 and September 9, 2023, Defendants ALVARADO and CAPRA, acting under color of law, deprived Plaintiff of the rights, privileges or immunities secured and guaranteed to him under the Eighth and Fourteenth Amendments to the U.S. Constitution.

164. Plaintiff was incarcerated under conditions posing a substantial risk of serious harm. He had been beaten by correction officers on September 5, 2023, staff had threatened his wife that Plaintiff "will not leave Sing Sing" if he did not stay quiet, and he remained confined, immobilized by his injuries, in an infirmary cell within the same facility and accessible to the same staff.

165. Defendant ALVARADO personally knew of that risk. ALVARADO responded to Plaintiff's cell on September 5, 2023, personally witnessed a portion of the assault, commanded the officers to stop, and remarked, in substance, "We don't do stuff like that." He knew that officers under his supervision and control had used excessive and unreasonable force against Plaintiff, and he knew where Plaintiff would thereafter be housed.

166. ALVARADO drew the inference that Plaintiff faced a substantial risk of further violence from correction staff. His statement to Plaintiff on or about September 11, 2023 that he would ensure that the beatings ceased confirms both that he understood the risk and that he knew the risk had already materialized.

167. ALVARADO disregarded that risk. Between September 5, 2023 and September 8, 2023, and upon information and belief, ALVARADO took no step to separate Plaintiff from the officers who had assaulted him, to restrict staff access to Plaintiff's infirmary cell, to arrange for Plaintiff to be monitored or safeguarded, to admonish or otherwise restrict the officers involved, or report them for disciplinary action, or to seek Plaintiff's transfer. As the sergeant who had supervised the officers and directed Plaintiff's transport, ALVARADO had the authority to take each of those steps.

168. Defendant CAPRA personally knew of the risk to Plaintiff at least as of September 7, 2023. On that date, a formal complaint was filed with OSI reporting both that Plaintiff had been subjected to an unlawful assault by correction officers at Sing Sing and that a correction officer had threatened Plaintiff's wife that Plaintiff would not leave Sing Sing if they did not keep quiet. Upon information and belief, CAPRA personally received or was personally informed of the substance of that complaint before the Infirmary Assaults occurred.

169. Upon information and belief, CAPRA drew the inference that Plaintiff faced a substantial risk of serious harm. CAPRA personally knew, before the Infirmary Assaults, that he had failed to implement the recommendations made by CANY in February 2022, and that in November 2022 more than 20 incarcerated individuals required medical attention, including seven who were transported to the hospital, after correction officers used unjustified force against them inside their cells during a coordinated prisonwide search. The November 2022

incident generated a criminal investigation by federal authorities, national media coverage, and civil litigation filed against the State in January 2023 by 26 of those individuals, supported by sworn affidavits. CAPRA superintended the facility where that force occurred. From those facts CAPRA drew the inference that correction officers at Sing Sing used unjustified force against incarcerated individuals confined to their cells, and disregarded the substantial risk of serious harm that such force posed to Plaintiff after he was beaten on September 5, 2023 and confined, injured and immobilized, in an infirmary cell accessible to the same staff.

170. CAPRA also personally had available to him, before the Infirmary Assaults, the publicly maintained records reflecting more than 650 substantiated reports of misconduct by DOCCS employees at Sing Sing, including numerous incidents involving the use of excessive force. CAPRA bore direct responsibility for staff discipline at the facility, and was therefore personally aware of the volume and character of those substantiated findings. From that knowledge, combined with the September 7, 2023 OSI complaint reporting the assault on Plaintiff and the express threat that Plaintiff would not leave Sing Sing if he did not keep quiet, CAPRA drew the inference that Plaintiff faced a substantial risk of serious harm from Sing Sing staff, and disregarded that risk.

171. CAPRA's disregard of the risk to Plaintiff is further reflected in his knowledge of SANTIAGO. On December 22, 2018, years before the Assaults, SANTIAGO was arrested by the New York City Police Department after he choked and otherwise assaulted an individual. DOCCS nonetheless retained SANTIAGO and continued to assign him to duties involving physical contact with incarcerated individuals. Upon information and belief, CAPRA, as the Superintendent responsible for staff management at the facility where SANTIAGO worked, knew and personally had available to him the fact of that arrest and of SANTIAGO's continued

retention and assignment before September 5, 2023. CAPRA thereby knew that SANTIAGO had a propensity to apply violent force, and specifically to apply force to a person's neck, and CAPRA disregarded that known risk. The risk materialized on September 5, 2023, when SANTIAGO applied a chokehold to Plaintiff's neck while Plaintiff was mechanically restrained and non-resisting.

172. CAPRA had the ability to take action that would have significantly reduced or eliminated that risk. CAPRA could have restricted staff access to Plaintiff's infirmary cell, transferred Plaintiff to another facility, suspended or reassigned the officers involved pending investigation, or ordered that Plaintiff be safeguarded.

173. CAPRA disregarded the risk and took none of those steps. Upon information and belief, CAPRA did not impose restrictions on staff access to Plaintiff, order any protective measure, or initiate any disciplinary action, between September 7, 2023 and September 9, 2023.

174. Had ALVARADO or CAPRA taken any of the protective measures within their respective authority after learning of the September 5, 2023 assault and the threat of further violence, the beatings Plaintiff suffered on September 8, 2023 and September 9, 2023 would not have occurred. The Infirmary Assaults were a reasonably foreseeable consequence of their disregard.

175. As a direct and proximate result of the foregoing, Plaintiff was assaulted and damaged on or about September 8 and 9, 2023, as set forth above, and suffered significant physical and ongoing physical and mental pain and anguish.

## PRAYER FOR RELIEF

**WHEREFORE**, DANE STUART respectfully requests judgment against Defendants as follows:

i. Compensatory damages against each of the Defendants, jointly and severally, in an amount to be determined at trial to compensate Plaintiff for his past, present and future pain and suffering;

ii. Punitive damages in an amount to be determined at trial;

iii. Reasonable attorneys' fees, costs and disbursements; and

iv. Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury in this action.

Dated: New York, NY
September 4, 2026

Margaret Gandy

Margaret Gandy (NY Reg. #4398426)
Elizabeth Geddes (NY Reg. #4348470)
Corva Law LLP
110 West 40th Street, Suite 1003
New York, New York 10018
(646) 974-1143
liz@corvalaw.com
maggie@corvalaw.com

*Attorneys for Plaintiff Dane Stuart*